IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MSW MEDIA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>Defendant. | No. 1:25-cv-2518-BAH |

**DECLARATION OF SHANNON R. HAMMER**

I, Shannon R. Hammer, declare as follows:

1. I am currently an Assistant Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division, Federal Bureau of Investigation (FBI), Winchester, Virginia, and I currently serve as the Acting Section Chief for RIDS. I have held an Assistant Section Chief position since January 2024. I joined the FBI in October 2006, and prior to becoming the Assistant Section Chief of RIDS, I held the positions of Acting Assistant Section Chief of RIDS; Unit Chief of the National Security and Classification Operations Unit; Unit Chief of a Freedom of Information/Privacy Act (FOIPA) Operations Unit; and a supervisor in the Initial Processing Operations Unit. In those capacities, I had management oversight for the RIDS national security review program, enterprise declassification review compliance pursuant to Executive Order 13526, and classification reviews for civil and criminal discovery matters; and I oversaw the front-end operations of the FBI's FOIPA program.

2. In my official capacity as Acting Section Chief of RIDS, I supervise nine Federal

Bureau of Investigation Headquarters (FBIHQ) units and two field operational service center units. RIDS' collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA, 5 U.S.C. § 552, as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974, 5 U.S.C. § 552a; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, including information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3. Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA and the Privacy Act of 1974. Specifically, I am familiar with the FBI's handling of Plaintiff's FOIA request that is the subject of this litigation.

4. Plaintiff, MSW Media, Inc., submitted a FOIA request to the FBI through its eFOIPA portal on July 22, 2025, seeking "all videos stored on SharePoint (on the unclassified side) or SharePoint or BuTube (on the classified side) which were created or used to train FBI personnel in how to review records about Jeffrey Epstein."[1] Plaintiff requested a fee waiver, and for the purpose of determining fees, that it be categorized as a member of the news media. Plaintiff also requested expedited processing of the request. (Ex. A.)

5. By letter dated July 29, 2025, the FBI acknowledged receipt of Plaintiff's FOIA request and notified Plaintiff it had assigned it FBI FOIPA Request Number 1675664-000. The

[1] An eFOIPA is an electronic means by which requesters can submit FOIA or Privacy Act requests to the FBI, online, through the FBI's public website, www.FBI.gov.

FBI also informed Plaintiff of the following: Plaintiff submitted its request via the FBI's eFOIPA system, the FBI determined it was compliant with the eFOIPA terms of service, and future correspondence about the request would be provided electronically; Plaintiff's request for a public interest fee waiver was under consideration, and Plaintiff would be advised of the decision at a later date, and if Plaintiff's fee waiver was not granted, Plaintiff would be responsible for applicable fees; and for the purpose of assessing any fees, the FBI determined as a general (all other) requester, Plaintiff would be charged applicable search and duplication fees. Additionally, the FBI informed Plaintiff it could check the status of its request and/or contact the FBI with any questions at www.fbi.gov/foia. Furthermore, Plaintiff could appeal the FBI's response to the Department of Justice (DOJ), Office of Information Policy (OIP) within 90 days of its letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting the Office of Government Information Services (OGIS). (Ex. B.)

6. In a second letter, also dated July 29, 2025, the FBI informed Plaintiff that "unusual circumstances" applied to its FOIA request. *See* 5 U.S.C. § 552(a)(6)(B)(iii). The FBI's letter advised that these unusual circumstances would delay the FBI's ability to make a determination on Plaintiff's request within 20 days. The FBI advised Plaintiff that it could file an appeal in writing to OIP within 90 days from the date of the letter and/or seek dispute resolution services by contacting OGIS. (Ex. C.)

7. By letter dated July 30, 2025, Plaintiff submitted an administrative appeal to OIP challenging the FBI's determination in response to FOIA request 1675664-000. Specifically, Plaintiff challenged the FBI's determination that Plaintiff was denied news media status. (Ex. D.)

8. By letter dated July 31, 2025, OIP acknowledged receipt of Plaintiff's appeal of the FBI's determination in FBI FOIPA Request Number 1675664-000. OIP advised Plaintiff it

assigned it appeal number A-2025-02313. (Ex. E.)

9. On August 2, 2025, Plaintiff filed a complaint in the U.S. District Court for the District of Columbia.

10. On September 4, 2025, Plaintiff filed an amended complaint in the U.S. District Court for the District of Columbia.

11. By letter dated September 5, 2025, OIP informed Plaintiff that the FBI changed Plaintiff's fee category to representative news media in response to Plaintiff's FOIPA Request Number 1675664-000; therefore, OIP was closing Plaintiff's appeal. OIP advised Plaintiff that if Plaintiff had any questions regarding the actions of OIP, it could contact the Chief, Administrative Appeals Staff. (Ex. F.)

12. On December 7, 2025, Plaintiff emailed DOJ litigation counsel to demand that, among other things, the FBI also produce to Plaintiff the "[u]pdated training materials and workflow guidance" mentioned in a response to another FOIA requester. DOJ litigation counsel relayed this email to the FBI on December 8, 2025. The FBI determined that Plaintiff's demand was an improper attempt to expand its original FOIA request and that if Plaintiff wanted to seek disclosure of these additional records, it would need to submit a new FOIA request.

13. By letter dated June 30, 2026, the FBI informed Plaintiff it completed its search for and processing of records subject to the FOIA that are responsive to Plaintiff's request. The FBI's letter advised that media, consisting of videos, was reviewed, and the videos were being withheld in their entirety pursuant to 5 U.S.C. § 552(b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). The FBI advised Plaintiff that if it was dissatisfied with the FBI's determination, it could file an administrative appeal by writing to OIP within ninety days of the FBI's letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting OGIS. (Ex. G.)

14. On August 20, 2026, Plaintiff emailed DOJ litigation counsel to assert that it did not believe the FBI conducted an adequate search because slide decks were not produced. The FBI determined that Plaintiff's FOIA request, at issue in this litigation, did not request non-video items, and that this new demand was an attempt to expand the scope of Plaintiff's original FOIA request.

**PART II: THE FBI'S SEARCH FOR RESPONSIVE RECORDS**

15. In response to FOIA requests received by the FBI, the FBI often conducts a search of the Central Records System (CRS) to determine if the FBI has records about a particular subject. The CRS is where the FBI indexes information about individuals, organizations, events, or other subjects of investigative interest for future retrieval. Searches of the CRS are conducted through Sentinel's[2] search functions and do not actually produce the responsive records; rather, these searches provide the file numbers associated with indexed terms so that an Initial Processing Unit (IPOU) analyst may then gather the potentially responsive files from their holding locations to confirm responsiveness and, if responsive, import them into the FBI's FOIA Document Processing System (FDPS) for future FOIA processing by a disclosure analyst.[3]

16. In this case, the FBI reviewed Plaintiff's request and determined that the information responsive to its request had already been collected and housed within Administrative File 62F-HQ-A4051821 (the 62 file), which was created and maintained for the

---

[2] Sentinel is the FBI's next generation case management system which allows FBI personnel to create case records in, upload to, and manage CRS records.

[3] FBI's Records and Information Management Policy mandates that FBI personnel enter all federal records into an authorized FBI recordkeeping system. FBI personnel are responsible for managing records they create and receive, determining the record status for each, and importing records into an electronic recordkeeping system such as the Sentinel case management system. *See* FBI Records and Information Management Policy Guide, 1321PG at 11-12 (Section 2.9) (May 31, 2024), https://perma.cc/99GU-QR89.

purpose of compiling administrative (as opposed to investigative) records related to the process of responding to the Attorney General's February 27, 2025, directive to the FBI director.[4] Among other things, the FBI was instructed to compile the investigative records related to Jeffrey Epstein and redact them. Additionally, in order to comply with the Attorney General's directive, the FBI created, among other things, certain training videos on how to properly access documents for review, how to process files and redact information, and where to save processed files, as it related to the review of the investigative records about Jeffrey Epstein. The agency placed these videos in the 62 file. As a result of the prior collection of these training videos in the 62 file, the agency determined it was unnecessary to search other locations for records responsive to Plaintiff's request. And because the FBI knew where the responsive videos were located within the 62 file, the FBI further determined that it was unnecessary to develop and use search terms to locate those videos within the 62 file. Additionally, the FBI had previously searched the 62 file on July 29, 2025, in response to a request for records from another person, and had previously located all nine training videos. For the present FOIA request, the FBI thus determined that it had already searched the only location containing records responsive to this FOIA request and had already located the responsive videos. Accordingly, the FBI determined that no further search for records responsive to Plaintiff's FOIA request was necessary.

**PART III: JUSTIFICATION FOR NON-DISCLOSURE UNDER THE FOIA**

17. The FBI processed records deemed responsive to Plaintiff's requests to satisfy its obligations under the FOIA. Further description of the information withheld, beyond what is provided in this declaration, could reveal the actual exempt information.

---

[4] *See* Letter from Attorney General Pamela Bondi to FBI Director Kash Patel (Feb. 27, 2025), https://perma.cc/82T6-7SH9.

## JUSTIFICATION CODES AND INDEX

18. *Justification Codes:* The FBI applied numerical codes that coincide with specific categories of exempt information. This declaration and index demonstrate that all information withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions or is so intertwined with non-exempt information that segregation is not practicable without revealing the underlying exempt information.

19. Each instance of information withheld pursuant to a FOIA exemption is accompanied by a coded designation that corresponds to one of the categories listed below.[5] For example, if "(b)(5)-2" appears on a page, the "(b)(5)" designation refers to FOIA Exemption 5 privileged information. The numerical designation "2" following "(b)(5)" narrows the main category into a more specific subcategory, such as "Attorney Client Privilege."

| SUMMARY OF EXEMPTION JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Exemption 5** | **Privileged Information** |
| (b)(5)-2 | Attorney Client Privilege |
| **Exemptions 6 & 7(C)** | **Clearly Unwarranted/Unwarranted Invasion of Personal Privacy** |
| (b)(6)-1 & (b)(7)(C)-1 | Names and Other Identifying Information of FBI Special Agents and Professional Staff |
| (b)(6)-3 & (b)(7)(C)-3 | Names and Other Identifying Information of Third Parties Merely Mentioned |
| (b)(6)-8 & (b)(7)(C)-8 | Names and Other Identifying Information of Third-Party Victims |
| **Exemption 7(E)** | **Law Enforcement Techniques and Procedures** |
| (b)(7)(E)-3 | FBI Internal E-mail Addresses, Non-Public Web Addresses, Computer Banner Lines and non-Public Telephone Numbers |
| (b)(7)(E)-7 | Non-Public Database Identifiers and Printouts |

20. *Index:* In the index below, the FBI further categorizes its application of exemptions to better explain the nature of the information withheld pursuant to the provisions of

[5] The FBI has implemented standard codes for justification categories. Not all codes are applicable in each FOIA litigation; therefore, the codes in the "Summary of Exemption Categories" chart may not be sequential if certain codes are not relevant to the records at issue.

the FOIA.

| Media Identification | Exemption by Justification Category | Description |
|---|---|---|
| Video 1 | (b)(6)-1/(b)(7)(C)-1 | Screen recording featuring a live demonstration by IMD personnel of how to assign work for final review; no training slides are contained within the demonstration. |
| Video 2 | (b)(6)-1,3,8/(b)(7)(C)-1,3,8 | Screen recording featuring a live demonstration by IMD personnel of how to start reviewing work for final review; no training slides are contained within the demonstration. |
| Video 3 | (b)(6)-1,3/(b)(7)(C)-1,3<br>(b)(7)(E)-3 | Screen recording featuring a live demonstration by IMD personnel of how to access the investigative files; no training slides are contained within the demonstration. |
| Video 4 | (b)(6)-1,3,8/(b)(7)(C)-1,3,8<br>(b)(7)(E)-3 | Screen recording featuring a live demonstration by IMD personnel of how to access the Department of Justice's list containing victims' names; no training slides are contained within the demonstration. |
| Video 5 | (b)(6)-1,8/(b)(7)(C)-1,8 | Screen recording featuring a live demonstration by IMD personnel of how to flag a document on the FBI SharePoint for further review by a supervisor; no training slides are contained within the demonstration. |
| Video 6 | (b)(6)-1,3/(b)(7)(C)-1,3 | Screen recording featuring a live demonstration by IMD personnel of how to flag a document on the FBI SharePoint for further review by a supervisor; no training slides are contained within the demonstration. |

| | | |
|---|---|---|
| Video 7 | (b)(5)-2<br>(b)(6)-1/(b)(7)(C)-1<br>(b)(7)(E)-3,7 | Training video containing training slides. Created by IMD to train FBI personnel on how to review records about Jeffrey Epstein to comply with legal obligations, as directed by DOJ.[6] |
| Video 8 | (b)(6)-1,3,8/(b)(7)(C)-1,3,8<br>(b)(7)(E)-3 | Screen recording featuring a live demonstration by IMD personnel containing final review guidance; no training slides are contained within the demonstration. |
| Video 9 | (b)(6)-1/(b)(7)(C)-1<br>(b)(7)(E)-3 | Screen recording featuring a live demonstration by IMD personnel of how to import and export redacted investigative files; no training slides are contained within the demonstration. |

**EXEMPTION 5 – PRIVILEGED INFORMATION**
***(b)(5)-2: Attorney-Client Privilege***

21. In applying Exemption category (b)(5)-2, the FBI determined that it should withhold legal advice provided by Department of Justice attorneys to the FBI, which is reflected in Video 7, and is therefore protected by the attorney-client privilege. The FBI determined it created these videos as part of the Attorney General's directive to the FBI to provide the full and complete files related to Jeffrey Epstein to DOJ, to "ensure that any public disclosure of these files will be done in a manner to protect the privacy of victims and in accordance with law." *See, supra*, n.4. To accomplish the goal of transparency and releasing documents in accordance with

[6] The FBI has already disclosed the segregable, non-exempt training slides shown on Video 7 in the FBI Vault (https://www.vault.fbi.gov), and they can be located by searching for "Epstein Training" and then viewing pages 26-50 of the page titled "Records regarding the review of the Investigative Holdings related to Jeffrey Epstein Part 01." DOJ has also published the segregable, non-exempt portions of the training slides in the Epstein Library (www.justice.gov/epstein) as files EFTA00172446-EFTA00172470 and EFTA00172329-EFTA00172353.

the law and DOJ directives, the FBI, at the direction of DOJ lawyers, developed training materials for document reviewers to provide review protocols that inform whether and how to withhold certain information pursuant to various privacy statutes and grand jury restrictions.

22. These confidential communications were conducted between and among DOJ attorneys and FBI employees and reflect the rendering of legal advice and guidance. Specifically, the FBI withheld Video 7, which provided legal guidance from DOJ counsel relating to redaction placement on various documents as a part of record processing and in order to protect the privacy of victims in accordance with the law. The information shared between clients and attorneys was made in confidence, was not shared with or circulated to individuals outside the attorney-client relationship, and was made for the purpose of providing legal assistance or advice in relation to government legal positions.

23. The FBI determined that release of this attorney-client privileged information would cause substantial harm to the agency's ability to fulfill its mission. The agency determined that disclosure of confidential legal advice from DOJ attorneys would call into question the FBI's commitment to withhold confidential information shared between agency clients and attorneys and could dissuade agency attorneys and clients from fully sharing such information and endanger agency attorneys' ability to provide the best possible legal representation of their clients. Furthermore, the agency determined that disclosure of attorney-client privileged legal advice would provide an advantage to individuals seeking legal action against the government. It would provide information traditionally privileged in a legal context.

**EXEMPTION 7 THRESHOLD**

24. Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Pursuant to 28 U.S.C. §§ 533, 534, and Executive Order 12333, as

implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM) and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and to further the foreign intelligence objectives of the United States.

25. The FBI created these training videos to assist the agency in reviewing all information contained in the Epstein-related investigative files in order to determine whether the files could reveal additional information that would serve as a predicate to investigate uncharged third parties.[7]

26. The agency also determined that the training videos sought by Plaintiff had been developed and used in response to the Department of Justice's directive to the FBI to ensure that it would properly collect, review, redact as necessary, and deliver to the Department all Epstein-related investigative files. Among other things, the Attorney General had directed the FBI to conduct an investigation into why her order did not appear to have already been followed. This included a request by the Attorney General for a report of the FBI's findings about why the full set of Epstein-related investigative records had allegedly not been provided to the Department, as well as proposed personnel actions resulting from any potential misconduct. *See, supra*, n.4. The agency thus developed these training videos as part of its efforts to ensure compliance with the Attorney General's directive, including compliance with all applicable statutes and identification of persons potentially implicated in potential misconduct.

---

[7] *See* Memorandum from the U.S. Department of Justice and Federal Bureau of Investigation (July 6, 2025), https://perma.cc/9VYC-9SMF.

27. The FBI thus determined that these training videos were created to assist the agency with carrying out law enforcement purposes.

***FOIA Exemptions (b)(6) and (b)(7)(C)***
***Unwarranted Invasion of Personal Privacy***

28. The FBI withheld certain information contained in these videos under Exemptions 6 and 7(C). The FBI reviewed each piece of information revealed in these videos to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the videos at issue. It is the FBI's policy to release names of high-ranking FBI officials as well as individuals in public positions, as they have diminished privacy rights while acting in their official capacity. This policy is applied to the individual's position at the time of the document, and not the present. The agency also considered relevant information to determine whether the individual was deceased. In addition to evaluating information discernable from the agency's case files, the FBI also uses institutional knowledge gained from prior FOIA requests or internal records. By using institutional knowledge, the agency can identify with sufficient certainty the life/death status of certain individuals. Finally, the FBI uses the birth date and/or the date of the investigation to determine whether an individual is living or deceased, to the extent either or both of these pieces of information are discernable from the file. The date of birth is used to apply the judicially recognized "100-year rule," *i.e.*, if the individual was born more than 100 years ago, the FBI presumes that he or she is dead, and the name is released. If the FBI is unable to determine the life/death status of an individual through the use of these methods, the name of the individual is withheld pursuant to Exemptions 6 and 7(C), when the FBI finds disclosure would constitute an unwarranted invasion of those individuals' privacy should they still be living.

29. The agency balanced the privacy interest of each individual mentioned in the

training videos against the public's interest in disclosure of the videos. The FBI determined that release of this private information, including such things as names, email addresses, voices, faces, dates of birth, residences, and telephone numbers, would not shed light on the FBI's performance of its mission to protect the American people and uphold the Constitution of the United States or its function to: protect the United States from terrorist attack; protect the United States against foreign intelligence, espionage, and nefarious cyber operations; combat significant criminal cyber activity, public corruption, transnational criminal enterprises, white-collar crime, and violent crime; and protect civil rights.

***(b)(6)-1 and (b)(7)(C)-1: Names and Identifying Information of FBI Special Agents and Professional Staff***

30. In applying Exemption category (b)(6)-1 and (b)(7)(C)-1, the FBI withheld the names and identifying information of FBI Special Agents (SAs) and professional staff whose information appeared in these training videos. These FBI SAs and professional staff included employees who were assigned to conduct, supervise, and/or participate in the Epstein-related investigations. Other FBI SAs and professional staff included employees whose information appears in the videos and who were assigned to conduct, supervise, and/or participate in the administrative activities related to a request from AG Bondi for the production of the entire scope of files related to the investigation of Jeffrey Epstein. These responsibilities included, but are not limited to, the following: coordinating/completing tasks in support of the FBI's investigative and administrative functions, compiling information, and/or reporting on the status of the administrative activities.

31. Assignments of SAs to any particular investigation are not by choice. Publicity, adverse or otherwise, arising from a particular investigation, may seriously prejudice SAs' effectiveness in conducting other investigations or performing their day-to-day work. The

privacy consideration is also applied to protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the conduct of this or other investigations/investigative activities, whether or not they are currently employed by the FBI. FBI SAs conduct official inquiries into various criminal and national security violation cases. The publicity associated with the release of an SA's identity in connection with a particular investigation could trigger hostility toward a particular SA. During an investigation, an SA may engage with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. Individuals targeted by such investigations, and/or those sympathetic to those targeted, could seek to inflict violence on an SA based on their participation in an investigation. This is because an individual targeted by such law enforcement actions may carry a grudge against those involved with the investigation, which may last for years. These individuals may seek revenge on SAs and other federal employees involved in a particular investigation. In this case, the high profile and notoriety of the subject matter greatly increases the potential for targeting of these SAs. There is no public interest served by disclosing the SAs' identities because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. Accordingly, after balancing these SAs' substantial privacy interests against the non-existent public interest, the FBI determined disclosure of their identities would constitute a clearly unwarranted invasion of their personal privacy.

32. The FBI also withheld the names and identifying information of FBI professional staff pursuant to Exemptions 6 and 7(C). These FBI professional staff were assigned to handle tasks related to the deployment of training materials and processing the investigative files. Similar to FBI SAs, these FBI employees could be targeted for reprisal based on their

involvement in specific investigations/investigative activities. Furthermore, these FBI professional staff were, and possibly are, in positions of access to information regarding official law enforcement investigations and therefore could become targets of harassing inquiries for unauthorized access to investigations if their identities were released. Thus, these individuals maintain substantial privacy interests in not having their identities disclosed.

33. The FBI concluded that no public interest would be served by disclosing the identities of these FBI professional staff to the general public because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. Accordingly, after balancing these professional staff employees' substantial privacy interests against the non-existent public interest, the FBI determined disclosure of their identities would constitute a clearly unwarranted invasion of their personal privacy.

***(b)(6)-3 and (b)(7)(C)-3: Names and Identifying Information of Third Parties Merely Mentioned***

34. In applying Exemption category (b)(6)-3 and (b)(7)(C)-3, the FBI withheld the names and identifying information of third parties who were merely mentioned in the investigative records responsive to Plaintiff's requests. These underlying investigative records were used, in this instance, as screenshots or live feed for training purposes. Therefore, in the context of the training videos, they are merely mentioned for training purposes only. The FBI has information about these third parties in its files because these individuals were tangentially mentioned in conjunction with FBI investigative efforts. These individuals were not of investigative interest to the FBI. For example, the FBI determined that the information about third parties contained in the demonstrative files used in the training videos identified a witness, his or her attorney, a notary, a police detective, and individuals identified only, for example, by first name, first name and last initial, or a partial name. These third parties maintain substantial

and legitimate privacy interests in not having this information disclosed and thus, being connected with an FBI investigation. Considering the FBI is an investigative and intelligence agency, disclosure of these third parties' names and/or identifying information in connection with an FBI investigation carries an extremely negative connotation. Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them.

35. The FBI then considered whether there was any public interest that would override these privacy interests and concluded that disclosing information about individuals who were merely mentioned in an FBI investigative file would not significantly increase the public's understanding of the operations and activities of the FBI. Accordingly, after balancing these third parties' substantial privacy interests against the non-existent public interest, the FBI determined disclosure of their identities would constitute a clearly unwarranted invasion of their personal privacy.

***(b)(6)-8 and (b)(7)(C)-8: Names and Identifying Information of Third-Party Victims***

36. In applying Exemption category (b)(6)-8 and (b)(7)(C)-8, the FBI withheld the names and identifying information of third-party victims. Releasing these individuals' identities in the context of these investigative records would cause embarrassment, as well as unsolicited and unnecessary attention to be focused on these individuals. Such a release could force them to relive emotionally trying events, causing further invasion of their privacy, in excess of the harms they've already been forced to endure. Thus, these victims maintain strong privacy interests in the protection of such personal information. Furthermore, there is no legitimate public interest to be served by releasing the identities of these victims because their identities, themselves, would not shed light on the operations and activities of the FBI. Accordingly, after balancing these third-party victims' substantial privacy interests against the non-existent public interest, the FBI

determined disclosure of their identities would constitute a clearly unwarranted invasion of their personal privacy.

**EXEMPTION (B)(7)(E) INVESTIGATIVE TECHNIQUES AND PROCEDURES**

37. The FBI applied Exemption (b)(7)(E) to withhold information contained in these training videos because their release would disclose techniques and/or procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

38. Within the responsive videos, the FBI applied Exemption (b)(7)(E) to protect non-public information about FBI personnel appearing in the training videos and also to protect non-public databases and search results shown in those videos. Specifically, the FBI asserted Exemption 7(E) to protect the following categories of information.

***(b)(7)(E)-3: FBI Internal E-mail Addresses, Non-Public Web Addresses, Computer Banner Lines, and Non-Public Telephone Numbers***

39. In applying Exemption category (b)(7)(E)-3, the FBI withheld internal e-mail addresses, non-public web addresses, computer banner lines, and non-public telephone numbers of FBI personnel. Internal telephone numbers and non-public email addresses are operational tools and procedures for personnel to exchange sensitive law enforcement or intelligence information. The risk of circumvention occurs because, if disclosed, they could provide criminals with specific targets for possible cyber-attacks and other types of attacks on FBI secure communications. Releasing this information would provide criminals with specific targets for attacks on FBI communications through "spoofing" or other illegal means.[8] For example,

[8] As recently as June 5, 2024, the FBI's Portland Field Office warned the public of scammers spoofing caller ID information in order to falsely represent themselves as FBI agents

"spoofing" occurs when a criminal disguises a communication from an unknown source to appear as if the communication is coming from a known, trusted source. Spoofing occurs with emails, telephone calls, and websites. Criminals often use social engineering techniques to elicit sensitive information from the unsuspecting victim. This can be especially dangerous when criminals spoof numbers of law enforcement agencies so as to appear as if they are from official law enforcement agencies. Systems could be overwhelmed, negatively impacting investigations. Additionally, such actions could diminish the public trust which would result in loss of cooperation that would damage investigations. Considering the current cyber-security environment where government data breaches and other hacking attempts on government systems are prevalent, it is likely that the release of this type of information could provide hackers with avenues to exploit the FBI's Information Technology system. It is possible they could use this information to gain unauthorized access to FBI systems, view and/or manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and/or hinder the FBI's ability to enforce the law by disrupting the FBI's internal communications. Releasing this information poses substantial risks to FBI information systems, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law. Accordingly, the FBI asserted Exemption 7(E) to withhold this information.

***7(E)-7: Database Information and/or Search Results***

40. In applying Exemption category 7(E)-7, the FBI protected the identities of sensitive investigative databases and database search results located through queries of these

---

and demand payment from victims. FBI Portland advised that in 2023, 14,190 people were victims of government impersonation scams, with losses totaling more than 394 million dollars. *See FBI Warns Public to Beware of Scammers Impersonating FBI Agents and Other Government Officials*, FBI (June 5, 2024), https://perma.cc/5RUX-UFCC.

non-public databases used for official law enforcement purposes by the FBI that are shown in these training videos. Releasing the identities of these databases and any information located through queries of these databases would give criminals insight into the available tools and resources the FBI uses to conduct criminal and national security investigations (*e.g.*, the scope of information stored within the databases, how the FBI uses the databases to support its investigations, the types of information most valued by the FBI for particular investigations, and vulnerabilities of the databases).

41. Revealing the use of these databases in the context of FBI investigative records shown in these training videos, and the information generated through queries of these databases, would reveal the nature of their utility to FBI investigators and the scope of information stored within the databases. Disclosing when and why the FBI queries these databases would reveal key information about FBI investigative strategies. This is because different investigative databases contain varying datasets, and revealing the types of data sought by investigators in particular investigative circumstances would reveal the FBI strategies employed in response to different investigative circumstances. Additionally, disclosing the search results for particular subjects shown in these training videos would provide criminals with an understanding of the scope of FBI collected intelligence on particular subjects. It would expose possible intelligence gaps and/or intelligence gathering strengths. This would allow criminals to make informed decisions on how they might structure their behavior to exploit these strengths and weaknesses and avoid detection and/or disruption by the FBI.

42. Revealing the types of information stored in these databases would also reveal the types of information most useful to FBI investigators. This would provide criminals with an understanding of how they might structure their behavior and/or deploy countermeasures to

deprive the FBI of useful intelligence/evidence, thus jeopardizing the FBI's investigative mission.

43. Additionally, revealing the identities of these databases could jeopardize the FBI's investigative mission by revealing exactly where the FBI is storing and obtaining valuable investigative data. Knowing the database names makes the original source data an attractive target for compromise. It would allow criminals who gain access to FBI systems an idea of where they can go to discover what the FBI knows, how it gathered the information, and possible information regarding the FBI's investigative strategies. It would also offer criminals the opportunity to corrupt or destroy information stored within these databases. Release of the identities of sensitive investigative databases and database search results would impede the FBI's effectiveness and potentially aid in circumvention of valuable investigative techniques. Therefore, the FBI withheld this information pursuant to Exemption 7(E).

**FORESEEABLE HARM STANDARD**

44. The FOIA Improvement Act of 2016 generally adopted the foreseeable harm standard, directing agencies to withhold information under the FOIA only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption or disclosure is prohibited by law. Accordingly, the FBI's analysis of responsive records under the FOIA is a two-part process. First, the FBI determines whether a record is exempt pursuant to one or more FOIA exemptions. Second, if the record is exempt pursuant to one or more FOIA exemptions, the FBI then considers whether foreseeable harm would result from disclosure of the record. For the withheld records at issue here, the FBI conducted this two-part analysis and only withheld records where it determined the withheld record met both of these criteria. The FBI's foreseeable harm is more fully described within each of the above coded exemption justification

categories.[9]

## SEGREGABILITY

45. As discussed in ¶ 4 *supra*, the FBI identified a total of nine responsive video files consisting of one hour thirteen minutes and fourteen seconds. Eight of the nine videos (labeled above as Videos 1-6 and 8-9) are screen recordings featuring live demonstrations of how to navigate the FBI SharePoint and other FBI systems in order to conduct document reviews; no training slides are contained within the demonstrations. Only one of the nine videos (labeled above as Video 7) contains training slides and was "created or used to train FBI personnel in how to review records about Jeffrey Epstein." Following its segregability review, RIDS determined the nine videos required withholding in their entirety, pursuant to one or more of the cited FOIA exemptions. Any further segregation of this intertwined material would employ finite resources only to produce disjointed words, phrases, sentences, or visual images, that taken separately or together, would have minimal to no informational content.

[9] 5 U.S.C. § 552(a)(8)(A)(i)(II) does not impose a requirement to articulate harm for Exemption (b)(3).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through G attached hereto, are true and correct copies of information exchanged between Plaintiff and the FBI.

SHANNON HAMMER Digitally signed by SHANNON HAMMER Date: 2026.10.02 14:41:33 -04'00'

Shannon R. Hammer
Acting Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia