**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MSW MEDIA, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 1:25-cv-02518 (BAH) |
| DEPARTMENT OF JUSTICE, | * | |
| Defendant. | * | |

* * * * * * * * * * * * *

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff MSW Media, Inc. ("MSW Media") commenced this litigation pursuant to the Freedom of Information Act ("FOIA") to obtain copies of Federal Bureau of Investigation ("FBI") training videos pertaining to the review of records about Jeffrey Epstein ("Epstein"). (Hammer Decl., Dkt. #21-2, ¶ 4 (filed Oct. 2, 2026) (documenting request filed 22 July 2025).) After over a year of inaction, FBI finally decided to withhold nine videos in full that it claims to have located in response to another request a week after MSW Media made its request. (*Id.* ¶ 16 ("FBI had previously searched the 62 file on July 29, 2025, in response to a request for records from another person, and had previously located all nine training videos. . . . Accordingly, the FBI determined that no further search for records responsive to Plaintiff's FOIA request was necessary.").)[1] FBI now argues that it should be granted summary judgment and be forced to

---

[1] FBI does not explain why it filed a full-throated opposition to MSW Media's motion for expedited processing four months after allegedly becoming certain that it did not even need to search for responsive records because it had already determined that nine videos totaling slightly over one hour would constitute the entire corpus of responsive records, nor why it waited another seven months to deny those videos in full. In light of this troubling timeline, the Court should demand more information about its processing of this "request for records from another person," including when it made its final determination.

neither perform an actual search in response to *this* request (as clarified in December), nor to redact any information, if redactions are even appropriate after the passage of the Epstein Files Transparency Act, Pub. L. 119-38, 139 Stat. 657 (2025) ("EFTA"). The Court should deny FBI's Motion and grant MSW Media's Cross-Motion.

## ARGUMENT

This Opposition will focus on three primary arguments, two of which—regarding FBI's withholdings—are mutually exclusive. It will then address one remaining item for which FBI has made no argument and can be deemed to have conceded the matter. *See Schneider v. Kissinger,* 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (arguments that the non-movant does not address may be treated as conceded). First, FBI has not demonstrated that it conducted an adequate search for responsive records. Second, it cannot prevail on any withholdings that are prohibited by EFTA. Lastly, *if* the Court concludes that EFTA does not preclude FBI from withholding these videos, it cannot show that it has released all non-exempt information.

### I. SCOPE OF THIS BRIEF

In the interest of judicial economy, MSW Media elects up front to compromise on some issues it could have opposed. It makes these compromises solely in the interest of judicial economy, and the Court should not treat this as a concession that FBI's legal position was correct.

First, while MSW Media continues to maintain that FBI incorrectly refused to honor its clarification of its request sent on 7 December 2025, before FBI had conducted any search for records responsive *to this request*, it will not challenge FBI's failure to produce non-video records.[2]

---

[2] This may render the adequacy of the search point moot, depending on information FBI might provide in a supplemental declaration, but at this point it does not.

Second, MSW Media agrees that any investigative documents which appear in these videos (e.g., as examples of how to redact) may be redacted or obscured. This request is for videos about how FBI trained employees regarding the processing of records in the Epstein Files; not for the criminal investigative documents themselves. (*See* Hammer Decl. ¶ 16 (explaining that the 62 file—where these videos were stored—"was created and maintained for the purpose of compiling administrative (as opposed to investigative) records").)

Third, MSW Media agrees that names, phone numbers, email addresses, and similar *textual* information about FBI personnel and third parties merely mentioned may be redacted. MSW Media does not agree that faces or voices may be obscured or altered, except in the instance described next.

Fourth, *if*—and only if—the Court finds that EFTA does not preclude FBI from withholding these records, MSW Media agrees that the faces and voices of any FBI personnel presenting in the videos may be obscured or altered. Furthermore, MSW Media agrees that if FBI produces videos where the closed captions required by law[3] are visible, it may silence the audio completely. Lastly, MSW Media agrees that FBI may redact any specific information for which it has claimed Exemption (b)(7)(E). (*Id.* ¶ 19.) However, because MSW Media contends that EFTA prohibits FBI from withholding *any* of the information for which it has asserted exemptions—with the exception of information pertaining to victims—it will only agree to the alteration of these videos as described in this paragraph if the Court rules in FBI's favor on this threshold issue.

[3] "Where ICT [information and communication technology] displays or processes video with synchronized audio, ICT shall provide closed caption processing technology." 36 C.F.R. Pt. 1194, App. C § 413.1.

## II. FBI FAILED TO DEMONSTRATE THAT IT CONDUCTED AN ADEQUATE SEARCH

By FBI's own admission, it *never* conducted a search for records responsive *to this request*. Instead, it "determined that the information responsive to its request had already been collected and house within Administrative File 62F-HQ-A4051821 (the 62 file)," then "determined it was unnecessary to search other locations for records responsive to Plaintiff's request," then, because "FBI had previously searched the 62 file on July 29, 2025, to a request for records from another person, and had previously located all nine training videos," ultimately "determined that no further search for records responsive to Plaintiff's FOIA request was necessary." (*Id.*)

Critically, though, FBI never states *when* it made these alleged "determinations." Nor, in its rush to disavow MSW Media's 7 December 2025 clarification email (*id.* ¶ 12), does it address the leads actually provided in that email. In that email, MSW Media provided a link to a recent news article based on another FBI release. (Email from McClanahan to Altabet of 12/7/25, Dkt. #21-4, at 1 (filed Oct. 2, 2026) (referencing Jason Leopold, *Inside the FBI's Review and Redaction of Epstein Files*, Bloomberg News (Nov. 25, 2025), *at* https://www.bloomberg.com/news/newsletters/2025-11-25/epstein-files-new-fbi-emails-detail-review-special-redaction-project (last accessed Nov. 6, 2026) [hereinafter *Inside the FBI's Review*]).) That article explained, citing released records:

> The emails reveal the special training given to FBI personnel working on what it called the "Epstein Transparency Project." In some instances they referred to it as the "Special Redaction Project." The training entailed PowerPoint slide presentations and video instruction on how to review the files.

*Inside the FBI's Review.* Specifically, MSW Media stated, *inter alia*, "[W]e want to clarify that any and all training videos, even those embedded in Powerpoint decks, are responsive to this

request, and that they may be identified as being part of the 'Epstein Transparency Project' or 'Special Redaction Project.' And this includes both the original training videos and the '[u]pdated training materials and workflow guidance' mentioned in the 3/22 email released to Leopold." (Dkt. #21-4 at 1.)

This email reveals two infirmities with FBI's proffer in this case, which MSW Media hopes can be resolved by a supplemental declaration. First, FBI would need to confirm that all the administrative records from the "Epstein Transparency Project" and/or the "Special Redaction Project" were located in the 62 file.[4] Second, it would need to confirm that any videos in the "[u]pdated training materials and workflow guidance" promised on 22 March 2025 were also located in the 62 file.

This second item is the most problematic. As Leopold reported, the FBI Information Management Division ("IMD") wrote on 22 March 2025, "Updated training materials and workflow guidance is expected for dissemination later tonight." (*Id.* at 1.) However, FBI does not state when the 62 file was created or whether all training videos were uploaded to it upon creation. FBI only implies that the 62 file was created and maintained for the purpose of responding to a 27 February 2025 directive (Hammer Decl. ¶ 16), and the records released to Leopold were created as late as 14 October 2025 (Ex. A at 3).

Furthermore, the *Vaughn* index of records released to Leopold presents another troubling implication. According to that filing, page 217 is the form attached to this Opposition as Ex. A, page 3. Pages 218-220 are identified as, "Attachment to FD-1036 dated 10/14/2025, Titled

[4] This is possible, since one of the emails released to Leopold stated, "Videos posted to the Transparency Project SharePoint site are as follows: Video 1: How to use the SharePoint site[;] Video 2: How to redact using Adobe[;] Video 3: Transparency Training Video" (Excerpts of Released Records at 2, attached as Ex. A), and another released form referred to both "Transparency Project SharePoint Video Transcripts" and "SPECIAL REDACTION PROJECT." (*Id.* at 3.)

Transparency Project SharePoint Video Transcripts." And the item with Bates stamp 221 is a video file merely identified as "Final Training Video." Napier Decl., Dkt. #18-1, at 106 (filed Nov. 24, 2025), *Leopold v. DOJ*, No. 25-2848 (D.D.C.). The implication is that the "Final Training Video" processed for Leopold was created close in time to the form purporting to contain video transcripts, which was created on 14 October 2025. But in the instant case, FBI only processed the videos that had been identified in response to another request in July. (Hammer Decl. ¶ 16.) If other videos, including the one processed for Leopold, were created after 29 July 2025, but before FBI finally began searching for them in response to this case, then they are also responsive to MSW Media's request, even without the lead MSW Media provided to FBI in the 7 December 2025 email, and FBI could not simply process the videos which were in existence when it conducted a search for records responsive to *another request* in July.

FBI frames the 7 December 2025 email as "an improper attempt to expand its original FOIA request" (*id.* ¶ 12), but that vastly oversimplifies the document. Even if one assumes *arguendo* that part of the email expanded the scope of the request, it also served a second purpose: it provided FBI with *a lead* regarding how to locate responsive records. The case law in this Circuit is clear on this point: when performing a search, an agency may not "ignore what it cannot help but know" when faced with "a lead so apparent that the [agency] cannot in good faith fail to pursue it"). *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996). On 7 December 2025, MSW Media provided FBI with that lead when it told the agency that responsive videos would likely be associated with the Epstein Transparency Project or the Special Redaction Project, as well as pointing the agency to a recent release revealing that training videos may have been created as recently as October. It appears that FBI refused to follow that lead.

FBI relies on *Kowalczyk* and other inapposite cases to argue that a requester cannot alter any aspect of the request after it has been submitted—or after it has entered litigation, but that argument is not supported in this pure form in the majority of the case law. Instead, most of the cases to reach such a conclusion only did so because the requester had attempted to modify the request *after the agency conducted its search.* Even *Kowalczyk* itself reflected this understanding: "A reasonable effort to satisfy that request does not entail an obligation to search *anew* based upon a subsequent clarification. . . . Requiring *an additional search* each time the agency receives a letter that clarifies a prior request could extend indefinitely the delay in processing new requests." 73 F.3d at 388 (emphasis added). Judge Moss could have been discussing the instant case when he further developed this analysis three years ago:

> *Kowalczyk* is inapposite . . . . [I]n that case, the plaintiff sent his clarifying letter after the FBI already completed its search. Here, by contrast, the ACLU informed DHS that OIG is a likely source of responsive records on numerous occasions before DHS commenced its search. The concern identified by the D.C. Circuit then—that plaintiffs would indefinitely extend their FOIA requests by sending clarification letters—is not present here.

*ACLU v. DHS*, No. 20-3204, 2023 U.S. Dist LEXIS 57430, at *32 (Mar. 31, 2023) (citations omitted).

This understanding appears in numerous other cases. *See*, *e.g.*, *Tsai v. United States*, No. 25-5110, 2026 U.S. App. LEXIS 18993, ay *7 (D.C. Cir. June 30, 2026) ("Tsai's clarification surfaced approximately two years *after the IRS completed its search*.") (emphasis added); *Bonner v. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991) ("To require an agency to adjust or modify its FOIA responses based on *post-response occurrences* could create an endless cycle of judicially mandated reprocessing.") (emphasis added); *Gillin v. IRS*, 980 F.2d 819, 823 n.3 (1st Cir. 1992) ("However, the clarification came too late to be relevant, since it amounted to an impermissible attempt to expand a FOIA request *after the agency has responded and litigation*

*has commenced*.") (emphasis added); *Am. Ctr. for Law & Justice v. NSA*, 474 F. Supp. 3d 109, 131 (D.D.C. 2020) ("[A]n agency need not search *anew* based on late-breaking clarifications from a plaintiff.") (emphasis added) [hereinafter *ACLJ*]; *Brown v. Wash. Metro. Area Transit Auth.*, No. 19-2853, 2020 U.S. Dist. LEXIS 27076, at *36 (D.D.C. Feb. 18, 2020) ("Plaintiff failed to provide any clarification until *after his request was closed*.") (emphasis added).

As a brief aside, FBI weakly attempts to argue that MSW Media would be required to file an administrative appeal regarding its December email before this Court could address it. That argument fails both legally and factually. In the former respect, this argument is predicated on the Court's treatment of the December email as a new request and not as a clarification of an old one. On the contrary, that email was *directly related* to its original request. It did not *expand* the request; it simply told FBI where and how to look and to make sure not to miss the new videos. *Accord Rubman v. U.S. Citizenship & Immigration Servs.*, 800 F.3d 381, 392 (7th Cir. 2015) ("The cases cited by CIS on this point are not relevant because they all involved modified requests well outside of the scope of the original request."). There was a temporal linkage as well; MSW Media alerted FBI to the leads less than two weeks after FBI released the records revealing them. *Contra ACLJ*, 474 F. Supp. 3d at 132 ("ACLJ apparently did not even alert the NSA when it learned of Lynch's alias."). On the factual issue, MSW Media would only be required to file an administrative appeal if FBI had *informed it of the decision to ignore the December email*. Instead, FBI decided to quietly ignore the clarification email, apparently hoping for a further eight months that MSW Media would simply not notice.

Shorn of all of this support, FBI's argument becomes an attempt to establish a *per se* rule that no requester may be allowed to modify or clarify a request once litigation has begun because litigation is somehow "different." However, that approach has already been rejected by two other

courts sixteen years apart. In 2006, Judge Bates observed, "In this Court's experience, FOIA requests are frequently clarified or modified even after a lawsuit is filed." *People for Am. Way v. DOJ*, 451 F. Supp. 2d 6, 12 (D.D.C. 2006). In 2020, across the country, Judge Alsup rejected the argument in a similar situation with one sentence: "The agency provides no authority explaining why subsequent explanatory information from plaintiffs should not be factored into the scope of the agency's search." *Pub. Justice Found. v. Farm Serv. Agency*, No. 20-1103, 2020 U.S. Dist. LEXIS 184272, at *16 (N.D. Cal. Oct. 5, 2020). This Court should find FBI has similarly failed to pass Judge Alsup's test.

FBI can only earn summary judgment on the adequacy of its search in one way. It must present admissible evidence demonstrating that it processed all of the training videos that were in existence *when it retrieved them to respond to this case*. This entire question turns on that date. Not the date it "determined" that there were nine responsive videos in the 62 file without looking. Not the date it conducted a search of the 62 file for *other* records responsive to *another* request and "noticed" the nine videos. The date it actually opened the 62 file to search for videos responsive to this request. If that date was before 7 December 2025, then it did not need to follow the leads presented in the December email. If that date was on or after 7 December 2025, then it *did*, and any failure to do so is a failure to perform a reasonable search. If FBI provides—and clearly explains—a date which predates the December email, the Court may grant it summary judgment on this matter. If FBI provides another date or does not provide one at all, the Court should deny FBI's Motion and grant MSW Media's Cross-Motion.[5]

---

[5] This is not a speculative concern. On 29 July 2025, the same day FBI allegedly located the nine videos while searching in response to another request, it told MSW Media that it must invoke "unusual circumstances" because of the need to search a geographically distinct location, the need to search a voluminous amount of records, or the need to consult with another agency or two or more Department of Justice ("DOJ") components. (Ltr. from RIDS to McClanahan of 7/29/25, Dkt. #21-3, at 9 (filed Oct. 2, 2026).) Since FBI has not indicated that these videos

## III. EFTA PRECLUDES FBI FROM ASSERTING THESE EXEMPTIONS

On 19 November 2025, the Epstein Files Transparency Act, Pub. L. 119-38, 139 Stat. 657 became law. EFTA required FBI to release documents that otherwise might be exempt under FOIA, and it created an exclusive list of five categories of "permitted withholdings." *Id.* § (c). Four of these categories are irrelevant to this case. The remaining provision states, "The Attorney general may withhold or redact the segregable portions of records that—(A) contain personally identifiable information of victims or victims' personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* § (c)(1).

In other words, Congress plainly expressed congressional intent that the Government release any information that met the definition of the statute, and that means that FOIA—a more general statute passed prior to EFTA—cannot be cited to withhold information that falls within the jurisdiction of the later, more specific statute. The general-specific canon may be invoked when "both specific and general provisions cover the same subject," *Norwest Bank Minn. Nat'l Ass'n v. FDIC*, 312 F.3d 447, 451 (D.C. Cir. 2002), and when the two provisions are in conflict, *see* Antonin Scalia & Bryan A. Garner, *Reading Law* 183 (2012). When this occurs, "the specific provision is treated as an exception to the general rule." *Id.* This has occurred here, and EFTA's list of permissible exemptions is treated as an exception to FOIA's list of permissible exemptions.

The next question becomes, are these videos covered by EFTA? It is clear that they are. EFTA specifically refers to "All communications, memoranda, directives, logs, or metadata

---

required any consultations with other agencies or two or more DOJ components, the Court must conclude that FBI intended on 29 July 2025 to conduct another search, which it had not started yet.

concerning the destruction, deletion, alteration, misplacement, or concealment of documents, recordings, or electronic data related to Epstein, his associates, his detention and death, or any investigative files." Pub. L. 119-38 § 2(a)(8). FBI admits as much: "DOJ has already published the segregable, non-exempt portions of the training slides in the Epstein Library" with EFTA Bates stamps. (Hammer Decl. at 9 n.6.) This is uncontested and dispositive.

Simply put, there is no corresponding EFTA exemption for five of the six exemptions invoked by FBI. Covered files otherwise protected by the attorney-client privilege are not protected. Covered files that reveal unclassified law enforcement techniques and procedures are not protected. Covered files that reveal the names and other identifying information of third-party victims *is* protected, but those are the *only* people with cognizable privacy interests under EFTA. Most relevantly, neither "FBI Special Agents and Professional Staff" nor "Third Parties Merely Mentioned" (Hammer Decl. ¶ 19) are entitled to protection under EFTA. While FBI may disagree with this fact, it may not litigate it in this Court. This Court lacks authority to modify a statute; FBI must petition Congress if it does not want this information to be automatically releasable.[6]

## IV. THE INFORMATION IS NOT EXEMPT UNDER FOIA

As noted above, MSW Media will limit this discussion to two types of information: allegedly attorney-client privileged information, and specific information about FBI personnel.

### A. ATTORNEY-CLIENT PRIVILEGE

"The attorney-client privilege covers 'confidential communications between an attorney and [their] client relating to a legal matter for which the client has sought professional advice.'"

---

[6] That being said, as noted in Part I above, MSW Media will compromise on this point, and it does not insist that the Court order FBI to release the names and contact information for the FBI personnel who were required to present in these training videos or the third parties who were merely mentioned in them.

*Transgender L. Ctr. v. ICE*, 775 F. Supp. 3d 131, 150 (D.D.C. 2025) (quoting *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977)). To establish the attorney-client privilege, the agency must provide "detailed and specific information" establishing that the communication was confidential both when it was made and since. *Id.*

FBI fails this basic test when attempting to claim to Video 7 is allegedly privileged information. FBI merely states that it developed training materials "at the direction of DOJ lawyers." (Hammer Decl. ¶ 21.) It claims that Video 7 "provided legal guidance from DOJ counsel relating to redaction placement on various documents" (*id.*), while admitting that this video was "[c]reated by IMD to train FBI personnel on how to review records about Jeffrey Epstein to comply with legal obligations, as directed by DOJ." (*Id.* ¶ 20.) It does not attempt to describe what parts of the training video *created by FBI without DOJ's participation* revealed "'confidential communications between an attorney and [their] client relating to a legal matter for which the client has sought professional advice." Instead, it makes the argument that the entire video is privileged because a DOJ attorney told FBI to make it.

This is not the law. If an attorney directs an office to make a training video about how to properly lock the doors at night because not locking them might expose the office to legal liability, that does not make the training video attorney-client privileged material. If a DOJ attorney tells FBI to make sure to redact victims' names and FBI produces a training video that states, "make sure to redact victims' names," that does not make *even that line* attorney-client privileged material. When an attorney tells an agency to train its employees and it trains its employees, the training *is not attorney-client privileged material* just because an attorney told the agency to do it.

Again, this is not a speculative concern. The *only* description of this alleged legal advice is that it "relat[es] to redaction placement on various documents as a part of record processing and in order to protect the privacy of victims in accordance with the law." (*Id.* ¶ 22.) It is far from clear how anything about "redaction placement" could be considered confidential legal advice. This concern is exacerbated when the foreseeable harm FBI describes is literally a chilling effect described in such general terms that it could apply to any client and any lawyer (*id.* ¶ 23), which is exactly the type of claim the foreseeable harm standard was created to preclude.

**B. FBI SHOULD BE REQUIRED TO OBSCURE FACES AND VOICES**

As noted in Part I above, if the Court determines that EFTA does not act as an exception to FOIA, then MSW Media consents to the videos being altered to obscure or outright remove the faces and voices of the presenters. Why FBI declined to do this already is a mystery, since it would have complied with their segregability responsibilities, but the Court now should order them to. *See ACLU v. DOD*, 389 F. Supp. 2d 547, 572 (S.D.N.Y. 2005) ("I examined each of the Darby photographs, in both its original and redacted forms. Where I determined that the government could better mask identifying features, I ordered it to do so."), *aff'd*, 543 F.3d 59 (2d Cir. 2008), *rev'd*, 558 U.S. 1042 (2009).

In fact, *ACLU* was only ultimately reversed and vacated due to the passage of a specific statute. The Second Circuit affirmed it, explicitly stating that "because the district court has redacted the Army photos to remove all identifying features, there is no cognizable privacy interest at issue in the release of the Army photos." 543 F.3d at 86. At that point the Government prepared to release the redacted detainee photographs in question, but was prevented from doing so first by President Obama and then by the passage of the Department of Homeland Security

Appropriations Act, 2010, Pub. L. No. 111-83, § 565, 123 Stat. 2142 (2009). *See ACLU v. DOD*, 901 F.3d 125, 128 (2d Cir. 2018) (summarizing case history).

This remedy is well-favored historically. In *Zander v. DOJ*, Judge Bates described a comparable situation, in which:

> The Magistrate Judge recommended that the video be edited "in a way that will obliterate the faces" of the officers involved and then released, concluding that "[o]nce that is done, the safety of these law enforcement officers would in no way be further compromised" and that "obliteration of their faces would protect their privacy." The Magistrate Judge also rejected BOP's concerns regarding the expense of editing the video and the allegedly minimal value of the video after editing.

885 F. Supp. 2d 1, 6 (D.D.C. 2012). Judge Bates overruled the Magistrate Judge, but only because the exemption in question was Exemption (b)(7)(F), not (b)(7)(C). *Id.* at 7 ("Disclosure of a recording of a 'cell extraction' presents the possibility that other prisoners will learn the methods and procedures utilized by BOP officials, and that this information might be used to thwart the safe application of these techniques in the future."). Judge Bates declined to address the privacy claims at all.

Eight years later, however, the question before this Court was presented clearly to this Circuit, which soundly adopted MSW Media's position in a singularly memorable fashion:

> The government further does not explain why it cannot by use of such techniques as blurring out faces, either in the video itself or in screenshots, eliminate unwarranted invasions of privacy. The same teenagers who regale each other with screenshots are commonly known to revise those missives by such techniques as inserting cat faces over the visages of humans. While we do not necessarily advocate that specific technique, we do hold that the government is required to explain why the possibility of some similar method of segregability is unavailable if it is to claim the protection of the exemption.

*Evans v. BOP*, 951 F.3d 578, 587 (D.C. Cir. 2020). Like the D.C. Circuit, MSW does not necessarily advocate for cat faces to be superimposed on FBI presenters' faces, but since FBI has declined to make *any* comparable proposal, the Court may fairly consider it.

Similarly, any privacy interest that these presenters might have in their voices, *see Jigsaw Prods., Inc. v. SEC*, 824 F. Supp. 3d 56, 61 (D.D.C. 2026), is resolved simply by altering the audio track or relying on closed captions. MSW Media has consented to either if the Court declines to find that EFTA supersedes FOIA in this case, and FBI has failed to make any argument for why such alteration would be infeasible.

## V. MSW MEDIA IS ENTITLED TO A FEE WAIVER

MSW Media requested a public interest fee waiver in its original request. (Hammer Decl. ¶ 4.) It stated, "MSW Media (https://mswmedia.com/) operates numerous podcasts and blogs about federal government operations, including Mueller She Wrote, SpyTalk, Daily Beans, and Jack. It will clearly use its editorial skills to translate disclosed records into new material. Given the intense public and media interest in both the Epstein files themselves and the steps taken by FBI to review them, see e.g. https://www.nbcnews.com/politics/congress/fbi-personnel-jeffrey-epstein-filesmentioning-trump-dick-durbin-says-rcna219699, these videos will significantly increase public understanding of government operations." (FOIA Request, Dkt. #21-3, at 3 (filed Oct. 2, 2026).) FBI did not grant MSW Media's request.

FBI filed a motion for summary judgment on all counts. Count 4 concerns FBI's failure to grant MSW Media a public interest fee waiver. FBI made no argument and introduced no evidence regarding Count 4. The Court should deem this question conceded. *See Schneider,* 412 F.3d at 200 n.1.

However, even if the argument is not conceded, FBI cannot prevail. It has effectively admitted that MSW Media is entitled to a fee waiver. First, it reversed its previous decision and classified MSW Media as a representative of the news media during this litigation. (Hammer Decl. ¶ 11.) Then, when arguing for the privacy interests of FBI personnel, it referred to "the

high profile and notoriety of the subject matter." (*Id.* ¶ 31.) This satisfies the requirement that "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government," and MSW Media's status as a prolific podcaster and undisputed media entity further supports that conclusion.

MSW Media concedes that if the Court grants FBI's Motion for summary judgment, the fee waiver issue is effectively moot. However, if the Court rules in MSW Media's favor on any issue, it is not, and MSW Media respectfully asks the Court to grant summary judgment on Count 4 to it at that point.

## CONCLUSION

For the reasons described above, MSW Media is entitled to summary judgment on all contested issues, and FBI is entitled to summary judgment on no issues.

Date: November 7, 2026

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
1451 Rockville Pike
Suite 250
Rockville, MD 20852
501-301-4672
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MSW MEDIA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF JUSTICE,<br><br>Defendant. | * | Civil Action No. 1:25-cv-02518 (BAH) |

* * * * * * * * * * * * *

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Rule 7(h), Plaintiff MSW Media submits this response to Defendant's Statement of Material Facts.

1. Admit.

2. Admit that FBI made the claim. Deny that it is accurate.

3. Admit.

4. Deny. MSW Media provided clarification and leads to FBI.

5. Admit that FBI made the claim. Deny that it is accurate.

6. Admit that FBI made the claim. Deny that it is accurate.

7. Admit that FBI made the claim. Deny that it is accurate.

8. Admit.

9. Admit that FBI made the claim. Deny that it is accurate.

Date: November 7, 2026

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
1451 Rockville Pike
Suite 250
Rockville, MD 20852
501-301-4672
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*